UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

DONTIE S. MITCHELL,

                      Plaintiff                            DECISION AND ORDER

-vs-

                                                          06-CV-6278 CJS

NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES, et al.,

                      Defendants

_____

INTRODUCTION

      This is an action, pursuant to 42 U.S.C. § 1983 brought by plaintiff Dontie

Mitchell ("Plaintiff"), a prison inmate in the custody of the New York State Department of

Correctional Services ("DOCS"), against DOCS and various DOCS employees.  Now

before the Court is Plaintiff's motion [#37] for preliminary injunctive relief. For the

reasons that follow, the application is denied.

BACKGROUND

      In this action, Plaintiff alleges the following: 1) DOCS Inmate Grievance Program

is unfair and ineffective; 2) DOCS staff misuse the prison disciplinary system to harass

inmates; 3) DOCS provides an unsafe and psychologically damaging living

environment; 4) DOCS employees misuse mechanical restraints; 5) Southport

Correctional Facility's ("Southport") Mail Room Supervisor violates DOCS rules

concerning inmate mail; 6) DOCS denies inmates belonging to the Nation of Islam[1]

("NOI") religion a diet that conforms with their beliefs; and 7) Officials at Southport

denied Plaintiff religious meals on two occasions.

On April 10, 2008, Plaintiff filed the subject motion [#37] for preliminary injunctive

relief.  At the time he filed the motion, Plaintiff was housed at Southport.  Plaintiff's

application concerns alleged mail tampering and the alleged failure to provide an

appropriate religious diet.  Specifically as to mail, Plaintiff alleges that on a few

occasions, Southport's Mail Room Supervisor failed to deliver legal mail sent to him

from an attorney named Charles Carbone ("Carbone").  Plaintiff also alleges that a

DOCS directive, Directive 4422, which permits inmates to receive not more than five

pages of photocopies in regular correspondence, is unconstitutional.  Plaintiff seeks an

injunction requiring DOCS to reassign the Mail Room Supervisor and to rescind the five-

page photocopy rule.  As to his religious diet claim, Plaintiff states that "the Nation of

Islam has specific dietary laws its members are required to follow.  We are not

---

[1]The Second Circuit has described the NOI as follows: "The Nation of Islam is one of at least twenty sects of Islam. The Nation of Islam was founded in 1930 by Fard Muhammad (born Wallace D. Fard), who vanished four years later, and was succeeded by Elijah Muhammad. The Nation of Islam's theology and message address the need for economic well-being, dignity, and physical security from the police.  The Nation of Islam shares many beliefs and practices with other sects of Islam. All Muslims, including Nation of Islam followers, observe Ramadan, follow the Koran, accept that Allah is the only God and that Muhammad is Allah's prophet, and accept that Islam is based on "five pillars": declaration of faith, prayer, charity, fasting, and pilgrimage to Mecca. Unlike other Muslims, Nation of Islam members believe that Allah came to the United States in 1930 in the person of Fard Muhammad, and that Elijah Muhammad was God's messenger. Nation of Islam members do not recognize Orthodox Muslim priests (Imams) as religious leaders, and instead turn to their own ministers. The Nation of Islam also has a distinctive story of creation that accounts for the Nation of Islam tenet that black people are divine, and that white people are not.  The observant among Nation of Islam followers typically attend at least two congregational meetings a week. The religious service commonly held on Sunday usually begins with a Muslim prayer, and includes a lecture by the Minister, often on a theme germane to the black community. Adherents of Nation of Islam are directed to pray five times daily, facing east; to be clean-shaven; and to eschew pork, gambling, smoking, alcohol, drugs, gluttony, credit, and sex out of marriage." *Muhammad v. City of New York Dept. Of Corrections*, 126 F.3d 119, 121 (2d Cir. 1997).

supposed to eat white bread or rice, unkosher meats (if any), soy bean products, kidney beans, collard greens, processed meats, and other food items often served to us." (Motion [#37] at 2). Plaintiff seeks an injunction requiring DOCS to provide him with meals that conform to "the dietary laws of the Nation of Islam as set forth in How to Eat to Live, Volumes 1 and 2, by the Honorable Elijah Muhammad." (Motion [#37]).

On June 20, 2008, Defendants filed responsive papers.[2] Concerning Plaintiff's mail claims, Defendants submitted an affidavit from Angela Bartlett ("Bartlett"), the Deputy Superintendent for Programs at Southport. Bartlett states that pursuant to DOCS Directive 4422, "printed or photocopied material in excess of five pages are not permitted when arriving within regular correspondence." (Bartlett Aff. ¶ 7). Bartlett further indicates that "[c]orrespondents often use return addresses that look like legal entities to avoid . . . [the] five page limits." (*Id*. at ¶ 13). Bartlett states that in March 2008, Plaintiff received correspondence from an organization known as "MIM," which contained photocopied material in excess of five pages. (Id. at ¶ 14). The excess materials were returned to the sender. (*Id*.). With regard to legal mail from Carbone, Bartlett states that in or about March 2008, certain mail from Carbone was delayed in arriving at Southport because it had to be forwarded from Plaintiff's previous correctional facility. (*Id*. at ¶ 8). Subsequently, there was a further delay because

---

[2]On April 16, 2008, the Court issued a Motion Scheduling Order [#39], directing Defendants to file a response to the motion on or before May 2, 2008. Defendants failed to file a response by that date, and subsequently requested additional time to submit a response. The Court granted that request, and directed Defendants to file a response on or before June 3, 2008. The Court further ordered that Defendants' "response should include affidavits from persons with personal knowledge, and should address the specific issues raised by Plaintiff." (Amended Motion Scheduling Order [#41]). The Court subsequently extended Defendants' filing deadline to June 6, 2008. (Letter Order [#42]). On June 6, 2008, Defendants asked for a further extension of time to file, until June 20, 2008. The Court never acted on that request. Nevertheless, the Court will grant the extension *nunc pro tunc*.

officials at Southport were not sure that Carbone was a legitimate legal entity. (*Id.*).

Bartlett states that in or about March 2008, other correspondence was sent to Plaintiff

by Carbone, and officials at Southport sent the correspondence to Southport's

Superintendent for review, since "the contents did not appear to be legal in nature." (*Id.*

at ¶ 9).  The Superintended subsequently reviewed the materials and had them

delivered to Plaintiff.  Bartlett states that in April 2008, Southport received more

correspondence purportedly sent to Plaintiff from Carbone.  Corrections staff opened

the correspondence in Plaintiff's presence, and then requested permission from

DOCS's Counsel's office to investigate whether the materials were legal in nature.

Bartlett suspected that "Plaintiff and his correspondents were using Charles Carbone's

name on privileged correspondence to avoid the five page limit applicable to general

correspondence." (Id. at ¶ 19).  Bartlett called Carbone's office several times, but

Carbone did not return her calls. (*Id.*).  Officials at Southport subsequently removed

non-legal materials and delivered the legal materials to Plaintiff. (*Id.* at ¶ 10).   Finally,

Bartlett states that in May 2008, Plaintiff received correspondence from an entity known

as "Collective Legal Services," which did not appear to be legal in nature.  Officials in

DOCS's Counsel's office determined that Collective Legal Services was not a legal

entity, and that the mail was not legal mail, and they forwarded the mail to Plaintiff as

general correspondence. (*Id.* at ¶ ¶ 12, 20).

        Defendants also submitted an affidavit from Benjamin Rondeau ("Rondeau"), an

associate attorney in DOCS's Counsel's office.  Rondeau states that the five-page limit

on photocopies in general correspondence promotes security in the prisons.  In that

regard, he states that "[p]rior to implementation of the 5 page limit large amounts of

contraband was secreted between pages of printed or photocopied materials and sent to DOCS inmates via general correspondence which required extensive searching of such materials and contraband entering DOCS facilities." [sic] (Rondeau Aff. ¶ 2).  As for Plaintiff's correspondence, Rondeau states that Bartlett contacted his office several times concerning correspondence allegedly sent by Carbone.  Rondeau states that certain correspondence purportedly sent by Carbone was suspicious because it bore a return address in Oakland, California, while Carbone's office is in San Francisco.  (*Id*. at ¶ 6).  According to Rondeau, "Bartlett was legitimately concerned that Charles Carbone's name was being used in an attempt to circumvent the five page limit." (*Id*.).  Rondeau also states that in response to an inquiry from Bartlett, he determined that "Collective Legal Services" was not a bona fide "entity providing legal services." (*Id*. at ¶ 7).

Defendants submitted no affidavits concerning Plaintiff's religious diet claim. Instead, Defendants' counsel states that "insofar as plaintiff is seeking an Order directing DOCS to provide him with meals that conform to the dietary laws of the Nation of Islam, his Motion must be denied as he cannot show a likelihood of success on the merits." (Bove Decl. ¶ 3).  Defendants' counsel further states that "[t]he dietary component of plaintiff's (equal protection) claims against DOCS has been considered and ultimately rejected in several cases within the Second Circuit, *Muhammad v. Warithu-Deen Umar*, 98 F.Supp.2d 337 (W.D.N.Y. 2000) *citing, Allah v. Kelly*, 1999 U.S. Dist. LEXIS 21776, (W.D.N.Y. 1999); *Abdul-Malik v. Goord*, 1997 U.S. Dist. LEXIS 2047 (S.D.N.Y. 1997)." [sic] (Defendants' Memo of Law [#44] at 5).

5

On August 25, 2008, Plaintiff submitted a reply memo of law.  In the reply,

Plaintiff indicates, in relevant part, that his mail claim is actually broader than the

incidents described in his original moving papers.  However, the Court declines to

consider the additional allegations concerning mail tampering, since they were raised

for the first time in a reply brief.

On October 15, 2008 Defendants filed a sur-reply (Docket [#46]), stating that

Plaintiff has been transferred from Southport to Elmira Correctional Facility ("Elmira").

Defendants contend that Plaintiff's request for injunctive relief concerning mail claims is

now moot, since he is no longer housed at Southport.

DISCUSSION

The standard to be applied when considering an application for a preliminary

injunction is well settled:

> A party seeking a preliminary injunction ordinarily must show: (1) a
> likelihood of irreparable harm in the absence of the injunction; and (2)
> either a likelihood of success on the merits or sufficiently serious
> questions going to the merits to make them a fair ground for litigation, with
> a balance of hardships tipping decidedly in the movant's favor.  When the
> movant seeks a 'mandatory' injunction-that is, as in this case, an
> injunction that will alter rather than maintain the status quo-she must meet
> the more rigorous standard of demonstrating a 'clear' or 'substantial'
> likelihood of success on the merits.

*Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008) (citations omitted).  Violation of a

constitutional right is considered "irreparable harm." *Jolly v. Coughlin*, 76 F.3d 468, 482

(2d Cir.1996) ("The district court . . .  properly relied on the presumption of irreparable

injury that flows from a violation of constitutional rights."); *see also*, *Charette v. Town of*

*Oyster Bay*, 159 F.3d 749, 755 (2d Cir.1998) ("In the context of a motion for a

preliminary injunction, violations of First Amendment rights are commonly considered

6

irreparable injuries.") (citation and internal quotation marks omitted).

*Mail Claims*

Plaintiff alleges that Defendants have tampered with his mail, and that the DOCS policy concerning the number of photocopies that inmates can receive in a general correspondence letter is unconstitutional.  The legal principles concerning such claims are clear:

> Under the First Amendment, prisoners have a right to "the free flow of incoming and outgoing mail." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir.2003). "In balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail." *Id*. A prisoner's right to receive and send mail, however, may be regulated. *See Davidson v. Mann*, 129 F.3d 700, 702 (2d Cir.1997) (upholding the validity of a prison regulation limiting inmates' purchases of stamps for non-legal mail). Such regulation " 'is valid if it is reasonably related to legitimate penological interests.' " *Rodriguez v. James*, 823 F.2d 8, 12 (2d Cir.1987) (*quoting Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).
>
> ***
>
> In *Turner*, the Supreme Court instructed that courts reviewing the validity of prison regulations should apply several factors. First, "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Id*. Second, courts should assess "whether there are alternative means of exercising the right that remain open to prison inmates." *Id*. [482 U.S.] at 90, 107 S.Ct. 2254. Third, courts should consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id*. Finally, courts should consider the challenged regulation in relation to proposed alternatives. *Id*. "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation," whereas "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable." *Id*.

*Johnson v. Goord*, 445 F.3d 532, 535 (2d Cir. 2006).

Plaintiff's First Amendment claim is brought pursuant to 42 U.S.C. § 1983, and the legal principles applicable to such claims are also well settled:

> In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b)

7

that the defendant caused the plaintiff to be deprived of a federal right. *See*, *e.g., Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Additionally, "[i]n this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977).

*Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004).

Applying the foregoing legal principles, the Court finds that Plaintiff is not entitled to preliminary injunctive relief regarding his mail claims.  In that regard, the Court agrees that Plaintiff's application is moot to the extent that it sought relief specific to Southport's Mail Room Supervisor.  However, the application is not moot with regard to Plaintiff's claim concerning DOCS's five-page photocopy rule.  Nevertheless, Plaintiff has not shown a clear or substantial likelihood of success on the merits of his mail claims.  Instead, with regard to the correspondence allegedly sent by Carbone, it appears that officials at Southport had a reasonable basis to believe that Plaintiff was attempting to use Carbone's name to evade the five-page limit on photocopies for non-legal correspondence.  Moreover, it appears that the five-page limit is "reasonably related to legitimate penological interests," namely, prison security.  Additionally, the five-page limit does not impose a limit on the overall number of photocopies that an inmate may receive, but instead, only imposes a limit on the number of copies that may be included "within a [single] piece of regular correspondence." (Directive 4422, § III(G)(3). Directive 4422 does not impose a limit on the number of pieces of regular correspondence that an inmate may receive.   Accordingly, Plaintiff's request for injunctive relief as to his mail claims is denied.

_Religious Diet Claim_

Plaintiff alleges that the diet he is currently receiving violates his religious rights

8

under the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1(a), because it is inconsistent with the book  How to Eat to Live by Elijah Muhammad.  A detailed description of the legal principles applicable to such claims was recently set forth as follows:

> Courts have long understood that prisoners retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause. *See, e.g., O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S.Ct. 2400, 2404 (1987) ("Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion.") (citations omitted); *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804 (1974) (A "prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."); *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir.2003); *Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir.1999) ("Prisoners retain their right to religious freedom even when incarcerated."); *Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir.1997) ("[I]nmates are not stripped of their constitutional rights simply by virtue of their imprisonment, including their right to religious freedom.") (citation omitted).
>
> Since 1975 this Circuit has consistently recognized that the free exercise of religion includes "the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson*, 527 F.2d 492, 495-96 (2d Cir.1975) (denial of Kosher food to a Jewish inmate is not justified by an important or substantial governmental objective); *see, e.g., McEachin v. McGuinnis*, 357 F.3d at 203 ("[C]ourts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights. This principle was established in our circuit at least as early as 1975."); *Ford v. McGinnis*, 352 F.3d at 597 (Second Circuit decisions "have clearly established that a prisoner has a right to a diet consistent with his or her religious scruples."); *Jackson v. Mann*, 196 F.3d at 320; *Bass v. Coughlin*, 976 F.2d 98, 99 (2d Cir.1992) ("At least as early as 1975, it was established that prison officials must provide a prisoner a diet that is consistent with his religious scruples. Kahane has never been overruled and remains the law.") (citation to *Kahane* omitted); *Benjamin v. Coughlin*, 905 F.2d 571, 574, 579 (2d Cir.), *cert. denied*, 498 U.S. 951, 111 S.Ct. 372 (1990); *Moorish Science Temple of America, Inc. v. Smith*, 693 F.2d 987, 990 (2d Cir.1982) ( "[T]he denial of kosher food to a Jewish inmate is not justified by an important or substantial

governmental objective.").

"'Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, [however,] are the interests of prison officials charged with complex duties arising from administration of the penal system.'" *Ford v. McGinnis*, 352 F.3d at 588 (*quoting Benjamin v. Coughlin*, 905 F.2d at 574); *see, e.g., O'Lone v. Estate of Shabazz*, 482 U.S. at 348-49, 107 S.Ct. at 2404; *Pell v. Procunier*, 417 U.S. at 822, 94 S.Ct. at 2804; *Jackson-Bey v. Hanslmaier*, 115 F.3d at 1096. A prison inmate retains First Amendment rights "that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. at 822, 94 S.Ct. at 2804; *accord, e.g., Shakur v. Selsky*, 391 F.3d 106, 113 (2d Cir.2004); *Giano v. Senkowski*, 54 F.3d 1050, 1053 (2d Cir.1995).

The standard to determine whether a prison official's conduct violates an inmate's First Amendment free exercise rights is "one of reasonableness, taking into account whether the particular [act] affecting [the] right ... is 'reasonably related to legitimate penological interests.' " *Benjamin v. Coughlin*, 905 F.2d at 574; *accord, e.g., O'Lone v. Estate of Shabazz*, 482 U.S. at 349, 107 S.Ct. at 2404-05; *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir.2006); *Young v. Coughlin*, 866 F.2d 567, 569 (2d Cir.), *cert. denied*, 492 U.S. 909, 109 S.Ct. 3224 (1989); *see also, e.g., Ford v. McGinnis*, 352 F.3d at 588 ("The free exercise claims of prisoners are ... judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.") (internal quotations omitted).

In evaluating the constitutionality of a restriction on an inmate's religious rights, four factors are considered:  "1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest."  *Salahuddin v. Coughlin*, 993 F.2d 306, 308-09 (2d Cir.1993) (*quoting Benjamin v. Coughlin*, 905 F.2d at 574); *accord, e.g., Salahuddin v. Goord*, 467 F.3d at 274; *United States v. El-Hage*, 213 F.3d 74, 81 (2d Cir.), *cert. denied*, 531 U.S. 881, 121 S.Ct. 193 (2000).  "In this analysis, we give deference to defendants because 'prison administrators ... and not the courts, [are] to make the difficult judgments concerning institutional operations.' " *Graham v. Mahmood*, 2008 WL 1849167 at *12; *see also, e.g., Fromer v. Scully*, 874 F.2d 69, 73 (2d Cir.1989); *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir.1985) (this

deference, however, is "by no means unlimited"); *Byrd v. Goord*, 00 Civ. 2135, 2005 WL 2086321 at *6 (S.D.N.Y. Aug. 29, 2005) (Daniels, D.J.).

As in other areas of the law, a burden shifting approach applies:

> The prisoner must show at the threshhold that the disputed conduct substantially burdens his sincerely held religious beliefs. The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; "the burden remains with the prisoner to 'show that these [articulated] concerns were irrational.' "

*Salahuddin v. Goord*, 467 F.3d at 274-75 (citations & fn. omitted); *accord, e.g., Johnson v. Guiffere*, 2007 WL 3046703 at *5; *Sproul v. Goord*, 2007 WL 2609787 at *11.

RLUIPA claims are similar to First Amendment free exercise claims, although RLUIPA "proceeds under a slightly different framework," protecting "inmates by providing that a government shall not 'impose a substantial burden' on the 'religious exercise' of inmates in certain institutions unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means." *Salahuddin v. Goord*, 467 F.3d at 273-74 (fn.omitted); *see also, e.g., Chavis v. Goord*, No. 00-CV-01418, 2007 WL 2903950 at *3 n. 3 (N.D.N.Y. Oct. 1, 2007); *Rahman v. Goord*, 2007 WL 1299408 at *5 (RLUIPA "imposes a more exacting standard on prison officials" than the First Amendment does.).

*Tafari v. Annets*, No. 06 Civ 11360(GBD)(AJP), 2008 WL 2413995 at *12-15 (S.D.N.Y. Jun. 12, 2008) (footnotes omitted), *report and recommendation adopted by Tafari v. Annets*, No. 06 Civ 11360(GBD)(AJP), 2008 WL 4449372 (S.D.N.Y. Oct. 2, 2008). With regard to RLUIPA claims, "[a] 'substantial burden' is defined as a 'situation where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Id*. at *14, n. 32 (citations omitted).

Based upon these applicable legal principles, the Court finds that Plaintiff has not demonstrated his entitlement to injunctive relief. In that regard, Plaintiff's claim is

essentially that as a member of the NOI, he is entitled to receive food as described in the

book  How to Eat to Live  by Elijah Muhammad.  Plaintiff further alleges that "the

Religious Alternative Meal (RAM) that DOCS offers prisoners does not reasonably

accommodate the dietary laws of NOI members." (Amended Complaint ¶ 151).  However,

as one court has explained,

> RAM was designed to accommodate the needs of many religious groups
> who have special dietary requirements, including Muslims, Hindus, Seventh
> Day Adventists, Buddhists and Rastafarians.  In addition, RAM
> accommodates the medical needs of some inmates, such as those with
> allergies to fish, eggs or dairy products, and those who wish a lower fat diet.
> RAM is a nutritionally adequate alternative to the regular menu.  RAM was
> designed so that it could be served in the same fashion and at the same
> time as the regular menu.  There is no dispute that a Muslim inmate can eat
> the food on the RAM menu without violating the tenets of Islam.

*Abdul-Malik v. Goord*, No. 96 CIV. 1021 (DLC), 1997 WL 83402 at *3 (S.D.N.Y. Feb. 27,

1997).  Moreover, although the NOI appears to differ significantly from other Muslim sects

in certain respects, courts in this Circuit, including this Court, have already found that the

RAM diet does not place a substantial burden on NOI members. *See, Allah v. Kelly*, 2000

U.S. Dist LEXIS 7107 at *4 (W.D.N.Y. Jan. 27, 2000) (Siragusa, J.) ("The plaintiff

contests the alternative methods available to NOI followers to supplement their diet and

claims there are forbidden foods not listed in the book "How to Eat to Live" by Elijah

Muhammad.  Magistrate Judge Heckman listed alternative means for the plaintiff to

supplement his diet, in addition to finding the RAM diet nutritional and satisfactory,

which this Court finds appropriate."); *Muhammad v. Warithu-Deen Umar*, 98 F.Supp.2d

337, 344 (W.D.N.Y. 2000) (Arcara, J.) ("Upon comparison of the foods offered in the

RAM menu with the dietary requirements described by Elijah Muhammad in "How to

Eat to Live," the court found that DOCS' accommodation of the plaintiff's religious diet

12

was reasonable and nutritionally adequate, and that the plaintiff's exercise of his religion was not substantially burdened. . . . The court also found that DOCS' adoption of the RAM diet was reasonably related to legitimate penological interests, under the *Turner/O'Lone* criteria. ") (discussing *Allah v. Kelly*).  Plaintiff has not demonstrated a clear or substantial likelihood of success on the merits of his religious diet claims. Therefore, Plaintiff's application for injunctive relief concerning his diet claims is denied.

CONCLUSION

Plaintiff's application for injunctive relief [#37] is denied.

So Ordered.

Dated:       Rochester, New York
             January 23, 2009

                           ENTER:


                           /s/ Charles J. Siragusa
                           CHARLES J. SIRAGUSA
                           United States District Judge