UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

DONTIE S. MITCHELL,

             Plaintiff,

    -vs-

New York State Department of
Correctional Services; et al.,

             Defendants.

**DECISION AND ORDER**
**No. 6:06-CV-6278(MAT)**

_____

## I.    Introduction

Plaintiff Dontie S. Mitchell ("Mitchell" or "Plaintiff") commenced this action pro se pursuant to 42 U.S.C. § 1983. In a Decision and Order entered September 28, 2011 (Dkt #100), the Court (Siragusa, D.J.) granted in part, and denied in part, Mitchell's motion to file a Second Amended Complaint (Dkt #62). This matter was transferred to the undersigned on October 26, 2012. (Dkt #146). Presently pending are Defendants' Motion for Summary Judgment (Dkt #111) and Mitchell's Cross-Motions for Summary Judgment (Dkt ##121, 142). Also pending are motions for joinder brought by various other DOCCS' inmates seeking to intervene in the present action, as well as Plaintiff's motions for reconsideration and for permission to further amend the Second Amended Complaint.

For the reasons discussed below, Defendants' Motion for Summary Judgment is granted, and Mitchell's Cross-Motions for Summary Judgment are denied. The remaining pending motions denied with prejudice as moot.

## II. Background

### A. Facts

Plaintiff's supporting allegations cover a number of disparate topics. To avoid unnecessary repetition, the facts pertinent to the alleged constitutional violations will be set forth below in the sections addressing Plaintiff's specific claims.

### B. Claims Asserted in the Second Amended Complaint

Plaintiff's Second Amended Complaint includes the following eleven claims: (1) DOCCS' inmate grievance program is unconstitutional and inadequate; (2) DOCCS' officials and employees misuse the disciplinary program in an arbitrary and unconstitutional manner; (3) the environment at DOCCS facilities is unsafe and psychologically damaging; (4) corrections officials engaged in the abusive and excessive use of mechanical restraints on Plaintiff while he was incarcerated at Southport Correctional Facility ("Southport"); (5) the mailroom clerk at Southport arbitrarily censored inmate mail, photos, and publications; (6) DOCCS failed to accommodate the religious diet of members of the Nation of Islam ("NOI"); (7) DOCCS failed to provide religious festival meals to members of the NOI; (8) DOCCS' Prison Rules 105.13 and 105.14, which prohibit gangs and unauthorized organizations, are unconstitutional; (9) DOCCS' grooming policy concerning dreadlocks is unconstitutional; (10) DOCCS has an unconstitutional policy of limiting the number of times an inmate

who is a registered member of one religion can attend the congregational services of other faiths; and (11) DOCCS' policy of serving soy-based foods violates the Eighth Amendment.

## III. General Legal Principles

### A. Motions to Dismiss Under F.R.C.P. 12(b)(6) and Motions for Summary Judgment Under F.R.C.P. 56

Defendants cite both Rule 12(b)(6) and Rule 56(c) in support of their motion to dismiss. Because Defendants have filed an Answer to the Complaint, it appears that this motion is more appropriately made pursuant to Rule 12(c). The Court need not decide the issue because in deciding a Rule 12(c) motion, the same standard as that applicable to a motion under Rule 12(b)(6) is applied. Desiano v. Warner-Lambert & Co., 467 F.3d 85, 89 (2d Cir. 2006). A dismissal motion may be treated as one for summary judgment if all parties are "given reasonable opportunity to present all material made pertinent to such a motion." Fed. R. Civ. P. 12(b)(6). E.g., Carione v. United States, 368 F. Supp.2d 186, 190 (E.D.N.Y. 2005).

In determining whether to convert a motion to dismiss into one for summary judgment, the "essential inquiry" is "whether the non-movant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings." Krijn v. Poque Simone Real Estate Co., 896 F.2d 687, 689 (2d Cir. 1990) (internal quotations

omitted). Here, Defendants provided Mitchell with notice of the consequences of failing to respond to a motion for summary judgment pursuant to <u>Irby v. New York City Transit Auth.</u>, 262 F.3d 412, 413 (2d Cir. 2001), and Mitchell cross-moved for summary judgment. Accordingly, the Court is satisfied that Mitchell was fully apprised of the potential that Defendants' motion would be converted.

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that a complaint may be dismissed for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, ___, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 556). Thus, unless a plaintiff's well-pleaded allegations have "nudged [his] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." <u>Twombly</u>, 550 U.S. at 570. The Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. <u>E.g.</u>, <u>Roth v.</u>

<u>Jennings</u>, 489 F.3d 499, 510 (2d Cir. 2007); <u>Cargo Partner AG v.</u> <u>Albatrans, Inc.</u>, 352 F.3d 41, 44 (2d Cir. 2003).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Initially, the moving party must show that there is "an absence of evidence to support the non-moving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). Once the moving party has carried its burden, the opposing party must set forth "specific facts showing that there is a genuine issue for trial[,]" FED. R. CIV. P. 56(e), and must introduce evidence beyond the mere pleadings to show that there is an issue of material fact concerning "an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322.

### B. 42 U.S.C. § 1983

In order to state a claim under 42 U.S.C. § 1983, the plaintiff must establish the following elements: (1) conduct attributable at least in part to a person acting under color of state law, and (2) deprivation, as the result of the challenged conduct, of a right, privilege, or immunity secured by the Constitution or laws of the United States. <u>Dwares v. City of</u> <u>New York</u>, 985 F.2d 94, 98 (2d Cir.1993). To bring a § 1983 claim

against a prison official, a plaintiff must allege that individual's personal involvement; it is not enough to assert that the defendant is a "link in the prison chain of command." McKenna v. Wright, 386 F.3d 432, 437 (2d Cir. 2004) (quotation omitted); see also Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

## IV. Discussion

### A. Claim One: Commissioner Fischer oversees an unconstitutional and inadequate grievance program.

Plaintiff charges that DOCCS' Commissioner Brian Fischer is liable for overseeing what he describes as an unconstitutional and inadequate inmate grievance program. This claim must be dismissed because inmates have no constitutional right to file a grievance. E.g., Tafari v. McCarthy, 714 F. Supp.2d 317, 349 (N.D.N.Y. 2010) ("While the First Amendment guarantees the right of access to courts, grievance programs [such as DOCCS'] were undertaken voluntarily and have no legal basis in the Constitution. Therefore these programs are not considered constitutional rights.") (citing Cancel v. Goord, No. 00 CIV 2042 LMM, 2001 WL 303713, at *3-4 (S.D.N.Y. Mar. 29, 2001) ("While there is a First Amendment right of meaningful access to the courts and a right to petition the government for redress, e.g., Bill Johnson's Rest., Inc. v. NLRB, 461 U.S. 731, 741 (1983) (finding that "the right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances"), inmate grievance procedures are not required by the Constitution and therefore a violation of

such procedures does not give rise to a claim under § 1983.") (citation omitted)); <u>Odoom v. Poirier</u>, No. 99 Civ. 4933(GBD), 2004 WL 2884409, at *10 (S.D.N.Y. Dec. 10, 2004) ("While the filing of grievances is constitutionally protected, the manner in which grievance investigations are conducted do not create a protected liberty interest.") (citing <u>Torres v. Mazzuca</u>, 246 F. Supp.2d 334, 342 (S.D.N.Y. 2003) (finding that because "[p]rison grievance procedures do not confer any substantive right upon an inmate requiring the procedural protections envisioned by the Fourteenth Amendment," claims that corrections officers failed to properly address plaintiff's grievances by conducting a thorough investigation to plaintiff's satisfaction must be dismissed).

**B. Claim Two: DOCCS' officials and employees misuse the disciplinary program in an arbitrary and unconstitutional manner.**

Mitchell asserts that DOCCS' disciplinary program "violates the rights of the plaintiffs [sic] to be free from cruel and unusual punishment and excessive fines and penalties, and due to due process of law under the Fifth, Eight [sic], and Fourteenth Amendment. . . ." Second Am. Compl., ¶ 86. Mitchell alleges that Commissioner Fischer, along with the Superintendents and Deputy Superintendents of all DOCCS' facilities, are liable for the program's shortcomings. Mitchell contends that the "systemic misuse" of DOCCS' disciplinary program causes severe psychological

and emotional distress within prisoners and ultimately leads to security and safety issues within DOCCS' facilities.

Conclusory allegations concerning Plaintiff's personal beliefs and opinions are insufficient to state a cognizable constitutional claim. See Alfaro Motors, Inc. v. Ward, ("[A]llegations which are nothing more than broad, simple and conclusory statements are insufficient to state a claim under § 1983."); see also Digges v. Helm, No. 9:09cv201, 2010 WL 3386427, at *5-6 (E.D. Tex. May 28, 2010) ("In Claim Three, Digges makes the bare allegation that '[t]he administrative grievance procedures in the . . . (TDCJ) are wholly unconstitutional,' unsupported by any allegation of facts. . . . Digges again makes a bare allegation that '[t]he disciplinary hearing process in the TDCJ is unconstitutional and devoid of the fundamental right to due process.' . . . .[H]is allegations are simply broad statements encompassing the entire system, to which he can hardly attest, and he provides no specific facts in support."), report and recommendation adopted, 2010 WL 3386412 (E.D. Tex. Aug. 25, 2010). Accordingly, Claim Two does not provide a basis for relief.

   **C.   Claim Three: DOCCS' facilities are physically unsafe and
         psychologically damaging.**

Mitchell asserts that "[s]taff harassment of prisoners and unprofessionalism, and the wanton use of excessive force and the wanton physical and emotional abuse of prisoners by staff members, is rampant within DOCS facilities; thus creating an

unconstitutionally unsafe and psychologically damaging environment, not only for prisoners but for staff members as well." Second Am. Compl., ¶ 87. Mitchell states that Commissioner Fischer, and the successors of any Superintendent or Deputy Superintendent, are liable for the actions of former Commissioner Goord and the previous Superintendents and Deputy Superintendents. Id., ¶ 116.

Most of Mitchell's allegations under this cause of action are general in nature. The only specific incidents of harassment alleged are as follows: Mitchell was "physically mishandled" by a guard during a pat frisk at Sing Sing in 2001; also in 2001, Mitchell witnessed guards at Upstate physically assault his cellmate, who was in mechanical restraints; Mitchell, along with other new prisoners, was "hassled" by a guard in D-Block at Attica in 2002; one guard at Clinton, on an unspecified date, issued an unspecified threat against Mitchell after a pat frisk; one guard at Clinton, on an unspecified date, "harassed and ridiculed Mitchell about his broken glasses." Second Am. Compl., ¶¶ 103-107.

All of these incidents are outside of the three-year statute of limitations applicable to actions brought under 42 U.S.C. § 1983. E.g., Edmonson v. Coughlin, 21 F. Supp.2d 242, 246 (W.D.N.Y. 1998). Moreover, none of them states a colorable constitutional claim. Mitchell, himself, has not alleged physical injury, and it is well-settled that claims of verbal harassment, without more, are not actionable under § 1983. See, e.g., Purcell

v. Coughlin, 790 F.2d 263, 265 (2d Cir. 1996) ("The claim that a prison guard called [plaintiff] names also did not allege any appreciable injury and was properly dismissed.").

> D. **Claim Four: The use of mechanical restraints for "Level One" inmates at Southport during recreation and visits is unconstitutional.**

Mitchell states that Southport employs a "Progressive Inmate Movement System" to classify inmates according to their disciplinary records. Second Am. Compl., ¶ 117. "Level I" prisoners are "forced to remain in mechanical restraints during recreation and visitation. Id. Mechanical restraints are removed only for "Level II" and "Level III" prisoners during these times. Id., ¶ 121. Inmates transferred into Southport are automatically placed in Level I, the most restrictive level of confinement, for at least a thirty-day adjustment period. Dumpson v. Goord, 2011 WL 4345760, at *1 (W.D.N.Y. Sept. 15, 2011) (Siragusa, D.J.) (citation to record omitted).

Mitchell states that he was forced to remain in mechanical restraints during recreation approximately 35 to 40 times from while placed in the Level I category during the orientation period upon his arrival at Southport in 2002, 2004, 2006, 2008, and 2010. Id., ¶ 123. In addition, Mitchell alleges that from 2002 to 2010, "different security staff" placed mechanical restraints on him in an "excessively tight" manner to the point that the metal bit or pinched his skin, causing discomfort. Id., ¶ 124. Mitchell also

alleges that being in the exercise yard in mechanical restraints poses a danger of physical harm due to not being able to catch one's balance or break one's fall when walking on icy surfaces. He asserts that he hurt his hip in such a fall. In addition, in 2006, when he was being transported from Elmira to Southport, Mitchell alleges that Southport guards placed mechanical restraints on him so tightly that it caused him to have an anxiety attack, and it took several requests before the guards finally loosened the restraints. Id., ¶ 127.

The Eighth Amendment, which applies to the states through the Due Process Clause of the Fourteenth Amendment, see Rhodes v. Chapman, 452 U.S. 337, 344-45 (1981), prohibits the infliction of "cruel and unusual punishments" on inmates, US. Const. amend. VIII. This prohibition includes the infliction of "unnecessary and wanton" pain on an inmate. Gregg v. Georgia, 428 U.S. 153, 173 (1976). To validly assert an Eighth Amendment claim for excessive use of force, an inmate must prove two components, one subjective and the other objective. Hudson v. McMillan, 503 U.S. 1, 7-8 (1992); see also Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999). "The subjective element is that the defendant must have had the necessary level of culpability, shown by actions characterized by 'wantonness[,]'" Blyden, 186 F.3d at 262 (quotation omitted), while "[t]he objective element is that the injury actually inflicted must be sufficiently serious to warrant Eighth Amendment

protection[,]" id. (citation omitted). The Eighth Amendment also guarantees some opportunity for exercise to prison inmates. Williams v. Greifinger, 97 F.3d 699, 704 (2d Cir. 1996) (citation omitted).

The Court finds that the allegations summarized above fail, as a matter of law, to state a claim under the Eighth Amendment as they lack both required elements–objectively serious harm to Mitchell and a wantonly reckless mental state by the unnamed defendants. Mitchell asserts that he was caused "discomfort" by the metal pinching his skin. Although he fell once while in restraints, he admits he did not suffer a significant injury. With regard to the subjective elements, there are no allegations that prison officials "maliciously and sadistically use[d] [the mechanical restraints] to cause harm," Hudson, 503 U.S. at 9. Mitchell admits that when he complained about the too-tight restraints causing him to have an anxiety attack, the Southport guards ultimately acceded to his request to loosen the restraints.

With regard to a possible restriction-of-exercise claim under the Eighth Amendment, Mitchell's allegations likewise do not raise a triable issue of fact. He "does not assert that physical exercise was made impossible or that the additional restraints themselves imposed any constitutionally cognizable discomfort." Brown v. Coughlin, No. 93-CV-633, 1995 WL 643349, at *3 (W.D.N.Y. Oct. 13, 1995) (granting summary judgment on Eighth Amendment claim);

accord, e.g., Dumpson v. Goord, 2011 WL 4345760, at *1; Dabney v. McGinnis, No. 97-CV-489A, 2006 WL 1285625, at *5-6 (W.D.N.Y. May 9, 2006).

**E.   Claim Five: The mailroom clerk at Southport interferes with inmate correspondence.**

Mitchell asserts that the senior mailroom clerk employed at Southport, K. Washburn, routinely opens outgoing prisoner mail and reads incoming prisoner mail without authorization. See Second Am. Compl., ¶ 131. He alleges that on several occasions in 2004, Washburn opened mail sent from him to the Maoist International Movement ("MIM") on the "pretext that it was business mail." Id., ¶ 132. Mitchell contends that the MIM does not charge inmates for subscriptions and therefore is not a business organization.

In addition, Mitchell contends, on two occasions in 2006, Washburn allegedly confiscated several sheets of two publications sent to him. The confiscation was based upon a DOCCS' policy that prisoners cannot receive more than five pages of photocopied or printed materials at one time. Consequently, Mitchell was forced to mail out the confiscated sheets at his own expense, "causing him grief frustration, and anger." Id., ¶¶ 140-41.

Mitchell generally accuses DOCCS officials of illegally preluding inmates from receiving books, such as The Art of War, The Art of Seduction, and Blood In My Eye, that he opines do not

necessarily violate the standards of 7 N.Y.C.R.R. § 712.2(i).[1]

Mitchell asserts that these books are disallowed because they are popular with inmates and express views with which DOCCS' officials disagree. Id., ¶ 147. He also alleges that "[p]laintiffs often must have their hip hop related magazines . . . redacted" based upon DOCCS' misinterpretation of certain gestures as gang-related. Id., ¶ 145.

In general, a prison official's interference with an inmate's mail implicates the First Amendment right to free speech, and interference with an inmate's legal mail also implicates the First Amendment right to access to courts. An inmate has the First Amendment right to "the free flow of incoming and outgoing mail." Johnson v. Goord, 445 F.3d 532, 534 (2d Cir. 2006) (quotation omitted). "In balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail." Id. (quotation omitted). A regulation limiting an inmate's right to

---

[1]

Pursuant to this regulation, DOCCS "reserves the right to deny the inmate publications which may be held noninciteful or nonadvocative, as the case may be, during the media review process, but which actually result in violence or disobedience after entrance into a facility, as is clearly set forth in paragraphs (h)(3) [precluding information that depicts or describes methods of escape from correctional facilities] (6) [precluding information that depicts or describe techniquess or methods for rioting and/or information instructive in hostage or riot negotiation techniques] of this section. Such items shall be referred to the Facility Media Review Committee, and if appealed, referred to the Central Office Media Review Committee, for decision." 7 N.Y.C.R.R. § 712.2(2)(i).

send and receive mail "'is valid if it is reasonably related to legitimate penological interests.'" Rodriguez v. James, 823 F.2d 8, 12 (2d Cir. 1987) (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)).

The regulation at issue here is set forth in 7 N.Y.C.R.R. § 720.4, "Incoming Mail." Section 720.4(a)(2) of 7 N.Y.C.R.R. provides that "[a]ll incoming general correspondence will be opened and inspected for cash, checks, money orders, printed or photocopied materials or contraband. The inmate's presence is not required during the inspection of incoming general correspondence." Id. (emphasis supplied). Section 720.4(c) of 7 N.Y.C.R.R. pertains specifically to printed or photocopied materials received by an inmate:

> (2) A limit of five pages of printed or photocopied materials (an individual newspaper clipping will be considered one page) may be received within a piece of regular correspondence (except as provided in paragraph (3) of this subdivision). . . .
>
> (3) Not to exceed once every four months, an inmate may make a written request to the superintendent to receive in excess of five pages of printed or photocopied legal papers specifically related to the inmate's current legal matter . . . within a piece of regular correspondence. The inmate shall make the request in advance, specifically identifying the legal papers, including the approximate number of pages, and state why they cannot be obtained via the facility law library or privileged correspondence. . . . If approved, the piece of correspondence must be received within 30 days thereafter. . . .

7 N.Y.C.R.R. § 720.4(c)(2)-(3).

With regard to the allegations regarding Washburn's allegedly improper opening of his personal mail to the MIM, Mitchell has not demonstrated that it was in violation of 7 N.Y.C.R.R. § 720.4, or that he suffered any actual injury as the result of the alleged tampering. See Moore v. Gardner, 199 F. Supp.2d 17, 27 (W.D.N.Y. 2002) (dismissing inmate's claims based upon tampering with personal and legal mail where inmate failed to demonstrate that suffered any resultant actual injury).

With regard to the confiscation of the pages in excess of the five permitted sheets of printed material, Mitchell does not dispute that he was in violation of the prison directive in question, 7 N.Y.C.R.R. § 720.4(c)(2). See Moore, 199 F. Supp.2d at 26 (rejecting inmate's claim that mail was illegally confiscated where it was "clear that the particular document was confiscated because plaintiff had violated the prison's directives" against using another inmate's return address).

Finally, with regard to his claim that DOCCS and its agents "have disallowed prisoners from receiving or possessing" certain books and have improperly redacted magazines due to concerns over gang-related material, Mitchell has not alleged that he personally was prevented from receiving or possessing any of the books listed or any other book, or that he his hip hop literature was improperly redacted. Thus, he has failed to allege any actual injury. See Allen v. Wright, 468 U.S. 737, 751 (1984) ("A plaintiff must allege

personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.") (citation omitted). This claim accordingly must be dismissed.

**F.  Claim Six: DOCCS fails to accommodate the religious diet of inmate-members of the NOI in violation of the First Amendment, the RLUIPA,[2] and the Equal Protection Clause.**

Mitchell, a member of the NOI, contends that DOCCS violates his rights under the First Amendment and the RLUIPA by serving soy beans, tuna fish, collard greens, sweet potatoes, white bread, baked foods, corn bread, hot cakes with syrup, and white rice. The issue of whether the diet served by DOCCS is appropriate for members of the NOI has been determined previously in favor of DOCCS.  See, e.g., Muhammad v. Warithu-Deen Umar, 98 F. Supp.2d 337, 345 (W.D.N.Y. 2000) (citing, inter alia, Green v. Coughlin, No. 88-CV-214 (N.D.N.Y. Oct. 11, 1991); Abdul-Malik v. Goord, No. 96 CIV. 1021(DLC), 1997 WL 83402, at *1 (S.D.N.Y. Feb. 27, 1997) (holding, after a bench trial, that "the RAM [Religious Alternatives Menu][3] menu provides a nutritionally adequate diet for

---

[2]
The Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc et seq.

[3]
The "RAM was designed to accommodate the needs of many religious groups who have special dietary requirements, including Muslims, Hindus, Seventh Day Adventists, Buddhists and Rastafarians. In addition, RAM accommodates the medical needs of some inmates, such as those with allergies to fish, eggs or dairy products, and those who wish a lower fat diet. RAM is a nutritionally adequate alternative to the regular menu. RAM was

-17-

an inmate who eats from that menu exclusively. . . . All that is
required for a prison diet not to burden an inmate's free exercise
of religion is 'the provision of a diet sufficient to sustain the
prisoner in good health without violating [his religion's] dietary
laws.' The RAM diet is sufficient to sustain prisoners in good
health and its consumption does not require any violation of the
tenets of Islam.") (quoting <u>Kahane v. Carlson</u>, 527 F.2d 492, 496
(2d Cir. 1975)).

In <u>Allah v. Kelly</u>, No. 96-CV-7323CJS(H) (W.D.N.Y. Apr. 19,
1999) (Report and Recommendation adopted on January 27, 2000), the
Court (Siragusa D.J./Heckman, D.J.) rejected the same claims raised
by Mitchell here. <u>See</u> <u>id.</u>, No. 96-CV-323CJS(H), slip op. at 9
(after comparing the foods offered in the RAM menu with the dietary
requirements described by Elijah Muhammad in "How to Eat to Live,"
the authority cited by Mitchell here, finding that DOCCS'
accommodation of the plaintiff Allah's religious diet was
reasonable and nutritionally adequate, and that the exercise of his
religion was not substantially burdened).

Mitchell's claim that DOCCS accommodates the dietary laws of
inmates of the Jewish faith but not those of the NOI in violation
of the Equal Protection Clause likewise is without merit. <u>See</u>

---

designed so that it could be served in the same fashion and at the
same time as the regular menu. There is no dispute that a Muslim
inmate can eat the food on the RAM menu without violating the
tenets of Islam." <u>Abdul-Malik v. Goord</u>, 1997 WL 83402, at *3.

<u>Simmons v. Robinson</u>, No. 07 Civ. 7383(DAB)(DFE), 2010 WL 5538412, at *13 (S.D.N.Y. Jan. 28, 2010) (rejecting claim that DOCCS violated the equal protection rights of Muslim inmates by failing to provide them with a halal diet equivalent to the kosher diet that Jewish inmates at Green Haven Correctional Facility receive) (citing <u>Majid v. Fischer</u>, 07 Civ. 4585(NRB), 2009 U.S. Dist. LEXIS 71616, at *14-30 (S.D.N.Y. July 31, 2009)).

G.  **Claim Seven: Plaintiff was denied two religious festival meals in violation of his rights under the First Amendment and the RLUIPA.**

Mitchell, a practicing Muslim and registered member of the NOI, asserts that he was denied the opportunity to observe the two EID festival meals, held after Ramadan, thereby violating his rights under the First Amendment and the RLUIPA. On November 20, 2004, Mitchell was keeplocked at Auburn Correctional Facility, no EID festival meal was provided to him because "Defendant John Doe #1 in E-Block . . . failed to notify the messhall to add Mitchell to the NOI feed up list. . . ." Second Am. Compl., ¶170. On January 26, 2005, Mitchell was confined at Southport and unable to attend the group EID meal. Mitchell claims that although he notified the Intake Sergeant, and received a personal confirmation from NOI Chaplain Conners that he would place Mitchell on the NOI feed up list, he never received the EID meal because of "Defendant John Doe #2." <u>Id.</u>, ¶ 172.

Defendants argue that the claims pertaining to the festival meals should be dismissed because Mitchell has failed to name either of the John Doe defendants, and the three-year statute of limitations has long since expired. The Court agrees. <u>See</u> <u>Abreu v. City of N.Y.</u>, 657 F. Supp.2d 357, 363 (E.D.N.Y. 2009) (Inmate was required to substitute named parties for the three unknown "John Doe" correction officers in his § 1983 complaint prior to the expiration of the three-year statute of limitations applicable to § 1983 claims brought in New York; at no point prior to the expiration of the limitations period, and indeed, at no time subsequent to it, either, did inmate seek to amend his pleading to substitute named parties for the placeholder John Doe defendants, and there was no indication that inmate ever even attempted to ascertain from the City defendants the identities of these unknown individuals).

## H.  Claim Eight: Prison Rules 105.13 and 105.14 are unconstitutional.

Mitchell challenges the constitutionality, as applied to him, of DOCCS' Prison Rules (prohibiting gang-related activities and materials), and 105.14 (prohibiting unauthorized activities and materials). <u>See</u> Second Am. Compl., ¶¶ 175-186. This claim stems from an incident on June 16, 2009, in which Mitchell was charged with possessing a typewritten document titled, "Body and Soul of UFD," and for possessing published literature regarding the

"New Afrikan Ujamaa Dynasty." Id., ¶¶ 178, 182. After a hearing, Mitchell was found guilty of violating Prison Rule 105.14, but not Rule 105.13. He also was found guilty of a different prison rule, Possession of Contraband, the application of which he does not challenge. He was sentenced with seven days in keeplock for both rules violations. Mitchell states that Prison Rules 105.13 and 105.14, as applied to him, violate his First Amendment rights. Because Mitchell was acquitted of violating Prison Rule 105.13, the only rule at issue here is 105.14.

In prison, an inmate "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). Thus, a prison regulation or practice limiting prisoners' incoming mail is valid if it is "'reasonably related to legitimate penological interests.'" Thornburgh v. Abbott, 490 U.S. 401, 413 (1989) (quoting Turner v. Safley, 482 U.S. at 89). Prison officials are not required to show with certainty that any particular correspondence would have adverse consequences. Procunier v. Martinez, 416 U.S. 396, 414 (1974). Instead, prison administrators are given "[s]ome latitude in anticipating the probable consequences of allowing a certain speech" in and out of a prison environment. Id. Courts owe "substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining

the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." Overton v. Bazzetta, 539 U.S. 126, 132 (2003) (citations omitted).

While all justifiable inferences must be drawn in the inmate's favor with respect to matters of disputed fact, in disputed matters of professional judgment the court's inferences must accord deference to the views of prison authorities. Beard v. Banks, 548 U.S. 521, 530 (2006) (citing Overton, 539 U.S. at 132). Unless a prisoner can point to evidence showing the policy is not reasonably related to legitimate penological objectives, sufficient to allow him to prevail on the merits, he cannot prevail at the summary judgment stage. Banks, 548 U.S. at 530.

Prison Rule 105.14 provides in pertinent part as follows:

An inmate shall not engage in or encourage others to engage in unauthorized organizational activities or meetings, or possess printed or handwritten material relating to an unauthorized organization where such material advocates either expressly or by clear implication, violence based upon race, religion, sex, sexual orientation, creed, law enforcement status or violence or acts of disobedience against department employees or that could facilitate organizational activity within the institution by an unauthorized organization.

Note: For purposes of this rule an unauthorized organization is any organization which has not been approved by the deputy commissioner for program services. Printed or handwritten material that could facilitate organizational activity includes, but is not limited to, a membership roster, organizational chart, constitution or by-laws. . . .

7 N.Y.C.R.R. § 270.2 (Institutional Rules of Conduct). Media Review Directive 4572 clarifies that

As noted above, Mitchell possessed information from the New Afrikan Ujamaa Dynasty, which, according to their website, "is a mass organization for the betterment of New Afrikan people . . . . The Ujamaa is part of the New Afrikan Liberation Movement led by the New Afrikan Maoist Party."[4] The organization's constitution indicates that the UFD (Ujamaa Field Dynasty) "shall be an independent subdivision of the Ujamaa Dynasty for youths, young adults and ex-lumpens [sic]. It shall have its own constitution and be lead by its own leadership but shall uphold this Constitution and the Program of the Ujamaa Dynasty."[5]

Even if application of the <u>Turner v. Safley</u> factors were to favor Mitchell, summary judgment for Defendants is warranted here on qualified immunity grounds because it was not clearly established, as of the time of the alleged violation, whether

---

[4]

According to their website, "[t]he New Afrikan Ujamaa Dynasty is a mass organization for the betterment of New Afrikan people . . . . The Ujamaa is part of the New Afrikan Liberation Movement led by the New Afrikan Maoist Party." The organization's constitution indicates that the UFD "shall be an independent subdivision of the Ujamaa Dynasty for youths, young adults and ex-lumpens [sic]. It shall have its own constitution and be lead by its own leadership but shall uphold this Constitution and the Program of the Ujamaa Dynasty." http://ujamaadynasty.wordpress.com/ 2009/05/26/announcing-new-afrikan-ujamaa-dynasty-website.

[5]

http://ujamaadynasty.wordpress.com/2011/05/17/ufd-constitution/.

-23-

prison rules restricting possession and use of materials published by the New Afrikan Liberation Movement, UFD, and related entities, were invalid under the First Amendment. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In evaluating whether a right was clearly established at the time a civil rights defendant acted, the court must determine: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." African Trade & Information Center, Inc., v. Abromaitis, 294 F.3d 355, 360 (2d Cir. 2002) (citations omitted). In determining whether qualified immunity applies, the Court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." Saucier v. Katz, 533 U.S. 194, 201 (2001). Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 812, 818 (2009), modified Saucier by holding that, "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory in all cases". Id.

Here, the Court need not decide whether the facts show a constitutional violation because even if it were eventually determined that the rules were constitutionally infirm as applied to Plaintiff, it was not clearly established, as of the time of the confiscation in 2009, whether prisons rules restricting possession and use by inmates of the New Afrikan Ujamaa Dynasty/UFD materials were invalid under the First Amendment. <u>See</u> <u>Neree v. O'Hara</u>, No. 9:09-CV-802 (MAD/ATB), 2011 WL 3841551, at *7 (N.D.N.Y. July 20, 2011) ("The court finds that the defendants who applied the amended DOCS policies with respect to UCC [Uniform Commercial Code] materials in connection with the three disciplinary hearings against plaintiff are entitled to qualified immunity, to the extent plaintiff claims those policies were invalid under the First Amendment. . . . [I]n the absence of controlling Supreme Court or Second Circuit authority, and in light of the split among the other circuits which have addressed the issue, it was not clearly established, as of 2009, whether prisons rules restricting possession and use of UCC materials by inmates were invalid under the First Amendment.").

I.    **Claim Nine: DOCCS' grooming policy is unconstitutional.**

Mitchell contends that DOCCS' grooming policy, which prohibits inmates from wearing their hair in dreadlocks unless they are registered members of the Rastafarian religion, violates inmates' rights to "freedom of expression" under the First Amendment and

discriminates against African-Americans. Mitchell himself was not forced to cut his hair and does not wish to wear dreadlocks. As he does not appear to have suffered any actual injury due to the application of this policy, he lacks standing to challenge it. In any event, Defendants point out, the issue is now moot, as DOCCS has amended the applicable Inmate Grooming Standard, Directive 4914(III)(B)(2). See Amaker v. Goord, No. 06-CV-490A SR, 2012 WL 4718661, at *8 (W.D.N.Y. Aug. 16, 2012) ("Directive 4914, which regulates Inmate Grooming Standards, was modified on September 2, 2010 to allow the 'dreadlock hairstyle.'") (citation to record omitted).

### J. Claim Ten: DOCCS' policy regarding attendance of religious services is unconstitutional.

Mitchell contends that DOCCS violates the First Amendment and the RLUIPA by allowing inmates to attend the services of a religion with which they are not registered only three times a year. Second Am. Compl., ¶ 199. Mitchell, who is a registered member of the NOI, states that he is aggrieved by this policy because he "desires to study all religions and attend their services," id., ¶ 201, any time he chooses.

While inmates are not stripped of their constitutional rights simply by virtue of their imprisonment, Wolff v. McDonnell, 418 U.S. 539, 555-56 (1974), including their right to religious freedom, Cruz v. Beto, 405 U.S. 319, 322 (1972), they retain only those rights consistent with legitimate penological objectives,

Giano v. Senkowski, 54 F.3d at 1053. "[R]easonable limitations on the accommodation of religious practices necessary to achieve those objectives are permitted[,]" and "[r]egistration is one such limitation." Jackson-Bey v. Hanslmaier, 115 F.3d 1091, 1096 (2d Cir. 1997). "[P]rison officials are not required to accommodate an inmate's religious demands without regard to whether or not the inmate is actually a member of the religion." Id. (citing Farid v. Smith, 850 F.2d 917, 926 (2d Cir. 1988) (summary judgment appropriate where inmate failed to prove that he sincerely held any religious belief mandating use of Tarot cards)). As the Second Circuit has explained, "[r]egistration eliminates speculation and guesswork on the part of prison officials and makes it less likely that a prisoner will manipulate the system by asserting various religions at different times." Jackson-Bey, 115 F.3d at 1097.

Here, Plaintiff is not entirely foreclosed from studying other religions, as he concedes he is able to attend the congregational services of a religion with which he is not registered three times a year. In addition, there are alternative means of studying other religious faiths, such as by reading their literature. Notably, he has not alleged that DOCCS has infringed upon his sincerely held religious beliefs by denying him participation in the congregational services of the religion in which he professes to believe, but rather that DOCCS does not permit him to participate whenever he chooses in other religions. He has come forward with no

-27-

caselaw supporting the proposition that prison inmates are constitutionally entitled to attend congregational services of any and all religions whenever they wish. In short, this claim fails to state a constitutional violation.

### K. Claim Eleven: DOCCS' service of soy-based foods violates the Eighth Amendment.

Mitchell contends that DOCCS' inclusion of soy-based foods in the diet provided to prisoners violates the Eighth Amendment's proscription against cruel and unusual punishment because the medical literature establishes that soy causes cancer and leads to emasculation. This claim is patently frivolous. See Martin v. Scott, 156 F.3d 578, 579–80 (5th Cir. 1998) (per curiam) ("Martin's claim that he was subjected to cruel and unusual punishment is frivolous. The conditions complained of by Martin, including his contention that he was subjected to cruel and unusual punishment when he became ill after being fed Vita-Pro—a soy-based meat substitute—simply do not rise to the level of cruel and unusual punishment.") (citing Helling v. McKinney, 509 U.S. 25, 36 (1993) (holding that the inmate must show that the risk of which he complains is "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk")).

## V. Conclusion

Defendants' motion for summary judgment (Dkt #111) dismissing the Second Amended Complaint is granted, and Plaintiff's Second

Amended Complaint is dismissed in its entirety with prejudice. Plaintiff's Cross-Motions for Summary Judgment (Dkt ##121, 142) are denied with prejudice.

In light of the Court's dismissal of Plaintiff's Second Amendment Complaint, the following motions are dismissed, with prejudice, as moot: Motion for Joinder by Raul Matamoros (Dkt #64); Motion for Joinder by Shawn Sutton (Dkt #95); Motion for Joinder filed by Josue Deliser (Dkt #96); Motion for Joinder by Jason O. Thompson (Dkt #132); Motion for Joinder by Aaron Isaiah Young (Dkt #133); Motion for Joinder by Robert Denis (Dkt #134); Motion to Join as a Party by Melundae Teasley (Dkt #136); Motion for Joinder by James Towner (Dkt #139); Motion for Joinder by Jamie Lamphear (Dkt ##152, 162); Plaintiff's Motion to File Amended Complaint (Dkt #150); Plaintiff's Fourth Motion to Amend Complaint (Dkt #153); Plaintiff's Motion for Reconsideration (Dkt #155) of Order (Dkt #144) Denying Injunctive Relief; Motion for Reconsideration (Dkt #156) of Order (Dkt #145) Denying Motion to Compel and for Miscellaneous Relief; Motion for Joinder by Donald Adams (Dkt #160); Motion for Joinder by Michael Shaw (Dkt #161); Motion for Joinder by Leonard Hinton (Dkt #165); Request for a Preliminary Injunction by Leonard Hinton dated December 13, 2012 (not docketed); Motion for Joinder by R. Guice dated November 18, 2012 (not docketed); Motion for Joinder by Junior Wilson postmarked November 19, 2012 (not docketed); Motion for Joinder by Hadji S.

Hill received November 21, 2012 (not docketed); and Plaintiff's Motion for Miscellaneous Relief, Including Appointment of Counsel and Class Certification (Dkt #166).

The Clerk of the Court is directed to close this case.

**ALL OF THE ABOVE IS SO ORDERED.**


S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge


Dated:    December 12, 2012
          Rochester, New York